# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

JASEN R. BRANNON,

      Petitioner,

v.                                        CASE NO. 8:05-CV-1598-T-27MAP

JAMES McDONOUGH,[1]

      Respondent.

_____/

## ORDER

Petitioner, a State of Florida inmate represented by counsel, initiated this cause of action by filing a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his 2000 convictions for aggravated battery and possession of a firearm by a felon entered in the Thirteenth Judicial Circuit Court, Hillsborough County, Florida (Dkt. 1). Respondent has filed a response to the petition (Dkt. 9) and Petitioner has filed a reply thereto (Dkt. 13). The matter is now before the Court for consideration on the merits of the Petition. An evidentiary hearing is not required for the disposition of this matter. Rules Governing Section 2254 Cases 8(a).

On May 7, 1999, Petitioner was charged by Information with attempted murder in the first degree, aggravated assault, and felon in possession of a firearm (Dkt. 10, Ex. 1). On March 16, 2000, the State filed a Notice of Intent to seek sentencing as an habitual

---

[1]James McDonough, the current Secretary of the Florida Department of Corrections, is substituted as the proper party respondent for James V. Crosby, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

felony offender and a prison releasee reoffender. Represented by court-appointed counsel, Petitioner proceeded to a trial by jury on a Supersedes Information on May 22, 2000.

On May 23, 2000, the jury returned a verdict of guilty of the lesser included offense of aggravated battery with a firearm and felon in possession of a firearm and not guilty on the charge of aggravated assault (Dkt. 10, Ex. 4). Petitioner was  adjudicated an habitual felony offender and prison releasee reoffender. After hearing pleas for leniency from Petitioner's maternal grandparents, mother, step-father, three uncles, including the victim, Randy Baggett, Sr. ("Baggett"), and a family friend on June 22, 2000, the trial court judge sentenced Petitioner under the Prison Releasee Reoffender Act ("PRRA"), Fla. Stat. § 775.082(9)(a)(1) (1999),[2] stating, "I want to make it clear to everybody.  There is nothing else I can do.  The case law indicates I have to do it.  It is not something I really want to do because I don't think it's going to serve any useful purpose in this particular case but having said that and him having been convicted of a second degree felony, I will adjudicate him guilty on Count One, it will be 15 years in the Florida State Prison with credit for time served."  Dkt. 10, Ex. 005 at R. 518. Petitioner was sentenced to serve a term of 67.8 months on the felon in possession of a firearm charge, with the sentences to run concurrently (Dkt. 10, Ex. 5). Petitioner was committed to the custody of the Florida

---

[2]The Court takes judicial notice of information available at the Florida Department of Corrections Information Network, http://www.dc.state.fl.us/, viewed November 4, 2006. *See* Fed. R. Evid. 201. Following his convictions in Hillsborough County, Florida, of aggravated assault on a law enforcement officer and resisting an officer with violence, Petitioner was sentenced on November 14, 1996 to serve concurrent sentences of one year and one day on each conviction. Petitioner was placed in the custody of the Florida Department of Corrections on December 31, 1996, where he remained until his release on July 1, 1997. *Id.* *See also* Dkt. 10, Ex. 019 at PCR 291. The PRRPA provides that defendants who commit certain enumerated crimes within three years of being released from a state prison are subject to certain enhanced sentences. *See* Fla. Stat. § 785.082 (1997). The shooting that is the subject of the instant petition occurred on April 24, 1999.

Department of Corrections where he remains, with an anticipated release date of March 26, 2015.

Represented by an assistant public defender, Petitioner pursued a direct appeal asserting that the trial court erred in: (1) denying the defense's motion to strike the jury panel; (2) sentencing Petitioner as a prison releasee reoffender on Count III of the Information; and (3) refusing to allow trial counsel to question Petitioner about his knowledge of a 1988 psychological report that discussed Baggett's propensity towards violence (Dkt. 10, Ex. 6). Petitioner's convictions and sentences were affirmed on September 7, 2001, per curiam, without written opinion (Dkt. 10, Ex. 8). *See Brannon v. State*, 799 So. 2d 1033 (Fla. 2d DCA 2001). The mandate issued on October 2, 2001 (Dkt. 10, Ex. 9).

Represented by counsel, Petitioner filed an application for state post-conviction relief pursuant to Fla. R. Crim. P. 3.850 on April 11, 2002 asserting the following grounds for relief:

1. Trial counsel, Shawn Davis, was ineffective for failing to properly explain the Prison Releasee Reoffender Act ("PRRA") to Petitioner;

2. The trial court committed fundamental error by failing to inquire of potential jurors whether they had overheard a conversation between the victim, the victim's father, and a prospective juror;

3. Trial counsel was ineffective for failing to proffer evidence of a psychological report of the victim or potential testimony by Petitioner regarding the report;

4. Trial counsel was ineffective for failing to investigate the victim's toxicology report, depose medical personnel, and gather further information to impeach the victim at trial;

5. The cumulative effect of [trial] counsel's deficient performance resulted in prejudice to Petitioner; and

6. The Prison Releasee Reoffender Act is unconstitutional as applied to Petitioner because it is violative of the *ex post facto* clause of the Constitution, and violates the separation of powers doctrine, equal protection, and due process.

Dkt. 10, Ex. 10. On August 29, 2002, the trial court entered an order denying Grounds Two, Three, and Six of Petitioner's Rule 3.850 motion and directing the State to respond to Grounds One, Four, and Five (Dkt. 10, Ex. 12). At the State's request, an evidentiary hearing was scheduled, and on October 17, 2002, Petitioner was granted leave to serve as co-counsel with his attorney of record (Dkt. 10, Ex. 14).

On November 19, 2002, Petitioner filed a second Rule 3.850 motion (Dkt. 10, Ex. 15) reasserting Grounds Two and Three of his first Rule 3.850 motion as Grounds One and Two:

1. Newly discovered evidence in the form of an affidavit from a potential juror who spoke to the victim and the victim's father prior to jury selection, [sic] which supported the claim that it was fundamental error for the trial court to fail to inquire whether other potential jurors overheard that prejudicial conversation; and

2. Ineffective assistance of counsel in failing to preserve [the] issue for direct appeal by failing to proffer evidence of [the] victim's psychological report or potential testimony by the [Petitioner] regarding his knowledge of that report.

Dkt. 1 at 3. Acknowledging that the issue in Ground One of the second Rule 3.850 motion had been raised on direct appeal and in Ground Two of his first Rule 3.850 motion, to avoid dismissal as a "successive" motion, *see* Fla. R. Crim. P. 3.850(f),[3] Petitioner argued that he was entitled to raise the claim again because it was based on "newly discovered evidence." Petitioner attached an affidavit to the second Rule 3.850 motion executed by Mr. Neiswonger, the prospective juror whose conversation with Baggett prior to the

---

[3]"A second or successive motion may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the movant or the attorney to assert those grounds in a prior motion constituted an abuse of the procedure governed by these rules." Fla. R. Crim. P. 3.850(f) (2002).

commencement of jury selection allegedly tainted the jury pool.  In his affidavit, Mr. Neiswonger averred that  following a discussion with Petitioner's grandfather in May 2002, he realized that his testimony before the trial court regarding his conversation with Baggett was incorrect (Dkt. 10, Ex. 15 at R. 205).  Mr. Neiswonger further averred that he had only recently learned that (1) when he told the trial court that he did not think that any other prospective juror overheard the conversation, he was not aware that other people in the hallway outside the courtroom were, like him, prospective jurors; (2) the prosecutor, engaged in conversation with another individual, was standing within three feet of Baggett and his father when Mr. Neiswonger was speaking with them; and (3) the person with whom the prosecutor was speaking at the time actually sat on the jury.

Petitioner asserted that the claim raised In Ground Two of the second Rule 3.850 relating to counsel's failure to proffer Baggett's psychological report, raised previously as Ground Three of his first Rule 3.850 motion, was not procedurally barred because, as the State argued on direct appeal, since the issue was not preserved at trial, it was not properly before the state appellate court on direct appeal. See Joiner v. State, 618 So.2d 174, 176 (Fla. 1993); Puryear v. State, 891 So.2d 2, 3-4 (Fla. 2d DCA 2004). See also Davis v. Sec. for the Dep't. of Corrs., 341 F.3d 1310, 1314 (11th Cir. 2003) ("[T]here is no question that Davis's counsel performed deficiently in failing, as required by Florida's Joiner rule, to renew Davis's Batson challenge before accepting the jury").  Following an evidentiary hearing held on February 27, 2003, the trial court entered an order denying both of Petitioner's Rule 3.850 motions on May 8, 2003 (Dkt. 10, Ex. 21). The state appellate court affirmed the trial court's decision on December 15, 2004, per curiam, without written

opinion. *See Brannon v. State*, 895 So. 2d 414 (Fla. 2d DCA 2004). The mandate issued on March 1, 2005 (Dkt. 10, Ex. 24).

Petitioner filed his petition for federal habeas relief on August 29, 2005, asserting four grounds for relief. Respondent acknowledges that the petition is timely but argues that it should be denied because Petitioner has failed to make the showing necessary for relief under 28 U.S.C. § 2254 (Dkt. 10 at 6). Having reviewed the record, the parties arguments, applicable statutes, and controlling case law, for reasons set forth below, this Court agrees with Respondent.

### Standard of Review

Pursuant to 28 U.S.C. § 2254(a), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), enacted and effective on April 24, 1996, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Where a state court initially considers the issues raised in the petition and enters a decision on the merits, 28 U.S.C. § 2254(d) governs the review of those claims. *See Penry v. Johnson,* 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003).

Habeas relief may not be granted with respect to a claim adjudicated on the merits in a state court unless the adjudication of the claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)   resulted in a decision that was based on an unreasonable
>         determination of the facts in light of the evidence presented in
>         the State court proceeding.

28 U.S.C. § 2254(d). *Price v. Vincent*, 538 U.S. 634, 638-39 (2003); *Clark v. Crosby*, 335 F.3d 1303, 1308 (11th Cir. 2003). Even where a state court denies an application for post-conviction relief without written opinion, in this circuit that decision is entitled to the same deference as if the state court had entered written findings to support its decision. *See Wright v. Sec. of Dept. of Corrs.*, 278 F.3d 1245, 1255 (11th Cir. 2002). Finally, a state court's factual finding is presumed to be correct, and a petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Henderson*, 353 F.3d at 890-91. Since Petitioner's conviction was entered after AEDPA was enacted, his petition is subject to the provisions thereof.

## Discussion

In 1999, Petitioner was living in the home of Harry and Lois Pierce, his maternal grandparents, while he recovered from injuries he suffered in a car accident. On April 24, 1999, Baggett, Petitioner's maternal uncle, drove his son, Randy Baggett, Jr., to Ms. Pierce's house to tow away a vehicle. Baggett entered his mother's house to use her telephone. Once inside, he discovered that Petitioner was using the telephone. Hurling expletives at Petitioner, Baggett exited the house. The domestic dispute that followed culminated with a bullet lodged in Baggett's back, paralyzing him for life. At trial, Petitioner asserted that he was acting in self-defense when he shot Baggett.

**Ground One**

In his first claim for relief, Petitioner asserts that:

The trial court violated [Petitioner's] Due Process and Sixth Amendment rights to present his defense of self-defense by prohibiting both introduction

of a psychological report on the victim[4] and testimony by the [Petitioner] describing how his review of this report heightened his fear of the victim.

Dkt. 1 at 4 (footnote added).  Respondent asserts that while Petitioner raised this issue on direct appeal, he did not exhaust the federal dimension of the claim. Pursuant to *Duncan v. Henry*, 513 U.S. 364 (1995), briefing an issue as a matter of state law is not sufficient to exhaust a federal claim on the same grounds. The record supports Respondent's position.   As the briefs Petitioner filed on direct appeal and in his post-conviction proceedings confirm, this issue was raised in state court in state law terms only. The claim is, thus, not properly exhausted in state court.  *See* 28 U.S.C. § 2254(b). Under the rules governing post-conviction relief in Florida courts, Petitioner's claim is procedurally defaulted because any new petition would be barred by multiple procedural rules, including the statute of limitations. *See* Fla. R. Crim. P. 3.850.

The Supreme Court has rejected the theory that by presenting the facts on which an alleged constitutional violation is based a petitioner implicitly raises the claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982). The petitioner must make the state court aware that the claims asserted present federal constitutional issues. *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir.), *cert. denied*, 525 U.S. 963 (1998).

---

[4]Baggett was arrested in 1988 on charges of burglary of a dwelling with a deadly weapon, aggravated assault, and two counts of kidnapping. The trial court ordered that he undergo a clinical examination and psychological testing to determine whether he was competent to stand trial (Dkt. 10, Ex. 022, Attach. at PCR 628). In his March 1, 1988, report, clinical psychologist Dr. Timothy Fjordbak concluded, *inter alia*, that Baggett's "clinically observed attitude of imperturbability and seeming failure to empathize with others were emperically [sic] replicated and together with findings indicative of an identification with dysocial values and suspiciousness suggested that [Baggett] has the potential for being a threat to others.  The potential for dangerousness associated with this type of character disturbance and organicity would be further escalated by the effects of alcohol and/or drug use, activities which [Baggett] has engaged in regularly." *Id* at PCR 640. Baggett was found competent to stand trial and following a plea of *nolo contendere* on July 6, 1988, he was sentenced to serve a 25-year term in prison, to be followed by 10 years probation. *See Baggett v. State*, 637 So.2d 303 (Fla. 1st DCA 1994). Petitioner contends when he was 12 years old Baggett, who had a third grade reading level, asked Petitioner to read Dr. Fjordbak's report and explain it to him.

Citing *Kelley v. Sec. for Dep't. of Corrs.*, Petitioner contends that his claim was presented to the state appellate court "such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation." 377 F.3d 1317, 1344-45 (11th Cir. 2004). Petitioner's argument is foreclosed by the Supreme Court's decisions addressing the exhaustion requirement. As the *Duncan* court held, clearly and unambiguously, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, *he must say so*, not only in federal court, but in state court." *Duncan v. Henry*, 513 U.S. at 365-366. As clarified more recently in *Baldwin v. Reese*, a decision focusing upon the requirement of "fair presentation" of a petitioner's claims in state court, the Supreme Court held that ["a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" 541 U.S. 27, 32 (2004).

Like Reese, Petitioner did not "fairly present" the federal dimension of his claim that the trial court erred in excluding testimony regarding the 1988 psychological report. The brief he filed in the state appellate court did not indicate in any way that Petitioner was complaining about a violation of federal law. *See* Dkt. 5, Ex. 001 at 8-11. The burden of "fairly presenting" the federal aspects of a petitioner's claim in state court rests with the petitioner.

The Court finds that Petitioner has failed to satisfy the requirement that he give the state court an "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Snowden v. Singletary*, 135 F.3d at 735 ("Exhaustion of state remedies

-9-

requires that the state prisoner fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights") (quoting *Duncan v. Henry*, 513 U.S. at 365).

A petitioner's claims or portions of claims which are not exhausted but would clearly be barred if returned to state court must be dismissed.[5] *See Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993). Here it would be futile to dismiss this case to give Petitioner the opportunity to exhaust the federal dimension of this claim because it could have and should have been raised on direct appeal. *See* Fla. R. Crim.P. 3.850(c).[6] Because Petitioner did not present his constitutional claim to the highest state court, it has not been exhausted and is now procedurally barred in state court.

Citing *Harris v. Reed*, 489 U.S. 255, 262 (1989), Petitioner contends that "the procedural default doctrine does not apply in this case. Petitioner contends that the trial court's finding that his claim that trial counsel was ineffective in failing to proffer evidence of the psychological report of Baggett or potential testimony by Petitioner that "there is no reasonable probability that the result of the proceedings would have been different" was a finding on the merits of [Petitioner's] claim that the trial court violated his due process and Sixth Amendment rights to present his defense of self-defense" (Dkt. 13 at 3-4).

In *Harris*, the Supreme Court held that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case " 'clearly and expressly' " states that its judgment rests on a state procedural bar." *Harris*, *supra* at 1043. Petitioner's reliance on *Harris* is

_____

[5]*See*, *e.g., Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

[6]Under Fla. R. Crim. P. 3.850(c), "grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal" are procedurally barred from collateral review.

misplaced. In this circuit, the courts follow the "familiar principle that federal courts may treat unexhausted claims as procedurally defaulted, even absent a state court determination to that effect, if it is clear from state law that any future attempts at exhaustion would be futile." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999). Where, as here, "the petitioner simply never raised a claim in state court, and it is obvious that the unexhausted claim would now be procedurally barred due to a state-law procedural default, the federal court may foreclose the petitioner's filing in state court; the exhaustion requirement and procedural default principles combine to mandate dismissal." *Id.* at 1303. The issue in this case is exhaustion of the federal dimension of the claim, a statutory requirement which the State did not expressly waive in this case. *See* 28 U.S.C. 2254(b)(3). *See also McNair v. Campbell,* 416 F.3d 1291, 1302-04 (11th Cir. 2005). In light of controlling case law, the Court finds Petitioner's argument unpersuasive.

A federal court may still review the merits of Petitioner's claim despite the procedural bar if he can show both "cause for the default and prejudice attributable thereto" or that failure to address the claim on the merits would lead to a fundamental miscarriage of justice, often referred to as the "actual innocence" exception, *see Wainwright v. Sykes*, 433 U.S. 72, 90 (1977). Cause must ordinarily be something external to the defense. *Marek v. Singletary,* 62 F.3d 1295, 1302 (11th Cir. 1995). To show prejudice, Petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152 (1982).

Petitioner contends that if the Court determines that the claim is procedurally barred, ineffective assistance of trial counsel in failing to preserve the issue and appellate counsel

in failing to raise the federal dimension of the claim on direct appeal establish cause for the default.

"Ineffective assistance of counsel may satisfy the cause exception to a procedural bar. In order to do so, however, the claim of ineffective assistance must have merit." *United States v. Nyhuis*, 211 F3d 1340, 1344 (11th Cir. 2000) (citing *Greene v. United States*, 880 F.2d 1299, 1305(11th Cir. 1989)). An ineffective assistance of counsel claim asserted as cause for another procedurally defaulted federal claim can, however, itself be procedurally defaulted, and unless the state prisoner can satisfy the cause and prejudice standard for the procedurally defaulted ineffective assistance of counsel claim, that claim cannot serve as cause for another procedurally defaulted claim. *See Murray v. Carrier*, 477 U.S. 478, 489 (1986).

Petitioner fails to assert cause for his failure to raise a claim that appellate counsel was ineffective in failing to raise the federal dimension of this claim in state court, thus this claim cannot be successfully asserted as cause for Petitioner's procedural defaulted. As discussed, in his first Rule 3.850 motion Petitioner asserted that trial counsel was ineffective in failing to properly preserve this issue by proffering Baggett's 1988 psychological report and the testimony Petitioner was prepared to give regarding the effect the report had on his state of mind when the shooting occurred. The trial court relied on the holding in *Medina v. State* that "[a]llegations of ineffective assistance cannot be used to circumvent the rule that postconviction proceedings cannot serve as a second appeal,"[7] 573 So.2d 293, 295 (Fla. 1990), to support its finding that Petitioner's claim was

---

[7]On August 26, 2004, the Florida Supreme Court readdressed this issue, concluding that where the underlying issue in an ineffective assistance of counsel claim was rejected on direct appeal because the issue was not preserved for review rather than decided on the merits, the trial court erred in denying his ineffective assistance of counsel claim as procedurally barred. *Pietri v. State,* 885 So.2d 245, 256 (Fla. 2004).

procedurally barred. When Petitioner raised the claim again in his second Rule 3.850

motion, the trial court addressed the merits of the claim, finding as follows:

> In ground 2, Defendant claims ineffective assistance of counsel due to counsel's failure to proffer evidence of a psychological report of the alleged victim or any potential testimony by Defendant regarding this report. Specifically, Defendant claims that the Court excluded the evidence, and counsel's failure to proffer said evidence resulted in the error not being preserved for appeal.
>
> At the evidentiary hearing, Defendant testified that a long time prior to the incident, he read a psychological report of Randy Baggett, which Mr. Davis possessed during his representation of Defendant. (*See* February 27, 2003 Transcript, pages 13 - 14, attached). When asked about the substance of the psychological report, Defendant testified as follows:
>
>> It indicated he had an organic brain disorder and that he had a propensity towards violence. He thought it was funny to hurt people. And that alcohol and drugs would increase this propensity and he had taken medication before and his intellectual reasoning level was like at the level of a certain grade which was a grade level of a child. They gave a lot of specific instances of his tendencies towards violence and he thought it was funny to hurt people.
>
> (*See* February 27, 2003 Transcript, page 14, attached). Defendant further testified that after reading the psychological report, it confirmed all his fears and gave him a medical standpoint that actually showed what he had always thought, and increased his fears. (*See* February 27, 2003 Transcript, page 15, attached). Defendant testified that when Randy confronted him on the day of the incident, after having read the report, Defendant was in fear of his life because he had seen what Randy had done to other people. (*See* February 27, 2003 Transcript, page 15, attached). Defendant testified that since self-defense was his theory of defense at trial, the report would have been relevant to prove Defendant's state of mind. (*See* February 27, 2003 Transcript, page 15, attached). Defendant testified that Mr. Davis never proffered the psychological report to preserve it for appeal. (*See* February 27, 2003 Transcript, page 16, attached).
>
> On cross-examination, Defendant testified that he read the psychological report sometime when Randy was in prison because Randy asked him to read it and explain it to him. (*See* February 27, 2003 Transcript, pages 17-18, attached). However, the report was generated on March 1, 1988, when Defendant was eleven years old as Defendant's date of birth is September 23, 1976. (*See* February 27, 2003 Transcript, page 18, attached). Defendant testified that at trial, he testified to certain instances of violence that he had

witnessed and heard about, and therefore, the jury was privy to that information. (*See* February 27, 2003 Transcript, page 19, attached). Moreover, Defendant testified that at trial, the jury heard what he was allowed to testify to regarding what was going through his mind at the time the incident occurred. (*See* February 27, 2003 Transcript, page 19, attached).

At the same hearing, Mr. Davis testified as follows:

> I know there was a psychological report that I had and I know the issue came up pretrial as to whether or not we were going to admit this and we agreed we would like to admit it. I know Judge Perry made a ruling that he was not going to allow it. He thought the probative value did not outweigh its prejudicial effect and he thought it was cumulative. I don't know whether that evidence or the denial of the admission of the evidence was at a pretrial conference a motion in limine, side bar or at trial. I know it was denied.

(*See* February 27,2003 Transcript, pages 41 - 42, attached); (*See also* February 27, 2003 Transcript, page 49, attached). When asked why he failed to proffer the report, Mr. Davis testified as follows:

> I remember trying the case knowing that Judge Perry had ruled that we are not going to be admitting the psychological report. If I did not proffer the evidence then the record would reflect that I didn't proffer it. I do remember speaking about it. I remember that Jasen knew that the report was not going to come in according to the judge's ruling. His family was aware that the report was not going to come in and we were disappointed with the ruling but we knew that was not going to come into evidence in front of the jury.

(*See* February 27, 2003 Transcript, page 42, attached).

However, Mr. Davis testified that at trial, during his direct examination of Defendant, he had Defendant go through a number of incidents of violence that Defendant was aware of, and also discussed with Defendant his fear of Randy. (*See* February 27, 2003 Transcript, page 42, attached). He further testified that Defendant's position was that he read the psychological report which added to the fear that he had of Randy, and provided a basis for the theory of self-defense based upon Defendant knowing Randy's violent propensity. (*See* February 27, 2003 Transcript, page 49, attached).

After reviewing ground 2, the testimony and evidence presented on February 27, 2003, the written closing arguments of both counsel, the court file, and the record, the Court finds that it is very unlikely that Defendant acted the way he did on the date of the alleged incident due to a report he read when

he was eleven years old.   Moreover, although Mr. Davis did not proffer the psychological report, during his direct examination of Defendant at the trial, Mr. Davis did have Defendant go through a number of incidents of violence that Defendant was aware of, and also discussed with Defendant his fear of Randy. Furthermore, the Court finds that there is no reasonable probability that the result of the proceedings would have been different, given the fact that the jury returned a verdict of Aggravated Battery with a Firearm, when Defendant was charged with Attempted Murder in the First Degree with a Firearm. Consequently, this Court finds that counsel has failed to meet the second prong of *Strickland* in that he has failed to prove how counsel's alleged deficient conduct resulted in prejudice. Since Defendant has failed to meet the second prong of *Strickland*, it is unnecessary to address the performance component. *See Kennedy v. State*, 547 So. 2d 912, 914 (Fla. 1989). As such, no relief is warranted upon ground 2.

Dkt. 10, Ex. 21 at PCR 416-19.

Without addressing the trial court's finding that this claim lacks merit, Petitioner cites the Supreme Court's decision in *Coleman v. Thompson, supra*, in support of his assertion that ineffective assistance of counsel "can constitute the type of 'external impediment' that satisfies the cause requirement" (Dkt. 13 at 5). Having failed to argue, much less demonstrate, that the trial court's finding that his ineffective assistance of trial counsel claim lacked merit is contrary to or an unreasonable application of clearly established Federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented, *see* 28 U.S.C. § 2254(d), Petitioner cannot successfully assert that claim as cause to excuse his procedural default. The Court finds, therefore, that Petitioner has not shown cause to excuse the default. *See Murray v. Carrier,* 477 U.S. 478 (1986); *Wainwright v. Sykes*, 433 U.S. 72 (1977).

An exception to the "cause-and-prejudice" requirement was recognized in *Sykes* when the Court stated that the standard developed there would not bar habeas relief for a victim of a "miscarriage of justice." *Id.* at 90. A petitioner in a collateral proceeding who wishes to establish his actual innocence to avoid a procedural bar to consideration of the

merits of his underlying claim must demonstrate that "a *constitutional* violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo,* 513 U.S. 298, 327 (1995) (emphasis added). This gateway applies only if the petitioner can demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *House v. Bell,* __ U.S. __, 126 S.Ct. 2064, 2076-77 (2006); *see also Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Schlup v. Delo*, 513 U.S. at 327-28).

In this context, Petitioner must show constitutional error coupled with newly discovered evidence that was not presented at trial which would establish factual innocence rather than mere legal insufficiency. *Id*; *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). *See also Schlup v. Delo*, 513 U.S. at 324. Petitioner does not assert that he has "new" reliable evidence of factual innocence, and there is nothing in the record that suggests a miscarriage of justice will occur if the Court does not reach the merits of these claims. *See Murray v. Carrier*, 477 U.S. at 495-96.

Petitioner fails to proffer "specific facts which support a finding that one of these exceptions to the procedural default rule exists," *Hill v. Jones*, 81 F.3d 1015 (11th Cir. 1996). The merits of Ground One will not, therefore, be addressed. *See Kight v. Singletary*, 50 F.3d 1539, 1541 (11th Cir. 1995).

## GROUND TWO

In Ground Two, Petitioner alleges that trial counsel was ineffective in failing to introduce a toxicology report that established that Baggett had a blood alcohol content of .09 when treated at the hospital following the shooting. Petitioner contends that the toxicology report would have impeached Baggett's credibility, called into question his ability

to observe and recall the events which led to the shooting, and corroborated Petitioner's testimony that he shot Baggett because he was in fear for his life.

This claim was raised in Petitioner's first Rule 3.850 motion. Applying the two-prong test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984), the trial court rejected the claim, finding as follows:

> In ground 4, Defendant claims ineffective assistance of counsel due to counsel's failure to investigate the alleged victim's toxicology report. Specifically, Defendant claims counsel should have deposed medical personnel and gathered further information to impeach Mr. Baggett's trial testimony. At trial, Mr. Baggett testified that he was not drinking on the day of the incident. However, Defendant claims that Mr. Baggett's toxicology report showed his alcohol level to be over the legal limit for driving a car in the state of Florida.
>
> At the evidentiary hearing, Defendant testified that during the course of his representation of Defendant, Mr. Davis received a toxicology report which showed the alcohol level of the alleged victim Randy Baggett Sr. (*See* February 27, 2003 Transcript, page 11, attached). Defendant further testified that Randy would get violent, aggressive, boisterous, picked fights, and became a bully looking for fights when he was drinking. (*See* February 27, 2003 Transcript, pages 11 - 12, attached). Defendant testified that he wanted the jury to hear that Randy had been drinking on that day because it went directly to Defendant's frame of mind at the time of the incident. (*See* February 27, 2003 Transcript, page 12, attached).   When asked if Mr. Davis attempted to introduce the toxicology report at trial, Defendant testified as follows:
>
>> What he did was he tried to - - he asked my uncle [Randy] if he was drinking that day and he said no he was not drinking that day. Then he asked well would it refresh your recollection if I were to show you this toxicology report and my uncle responded negatively. He said why not. He said well because I have never seen the report before. So then Mr. Davis I guess he was a little bit stunned and so was I. He just moved along and he didn't further impeach or further try to introduce into evidence.
>
> (*See* February 27, 2003 Transcript, pages 12-13, attached). Defendant testified that the jury heard Randy answer negatively to the inquiries regarding whether Randy had been drinking and whether Randy had seen the report, but the jury never heard the contents of the toxicology report and Randy drinking because Mr. Davis never explained what the report was or

the relevance of the report. (*See* February 27, 2003 Transcript, page 13, attached).

At the hearing, Mr. Davis testified that he did not remember having a discussion with Defendant about Randy's toxicology report, but believes that at trial, he asked both Randy and the Defendant whether Randy had been drinking on the day of the incident. (*See* February 27, 2003 Transcript, page 43, attached). After having his recollection refreshed with the trial transcript, Mr. Davis testified that he did recall asking Randy if he was drinking on the day of the incident, recalls Randy denying it, and tried to refresh Randy's recollection with a copy of the report, but Randy stated that he never saw the report before. (*See*. February 27, 2003 Transcript, page 52, attached). Whereupon, Mr. Davis moved on. (*See* February 27, 2003 Transcript, page 52, attached). Lastly, when asked about the jury not being privy to the toxicology report or an interpretation of the report, Mr. Davis testified as follows:

> That's correct. After reading the transcript it is starting to come back that I thought we had some evidentiary problems with the results coming in and what I wanted him to do was admit to the fact that he was drinking and show him a copy of the report to refresh his recollection. Once he told me he did not remember and it would not help him refresh, my understanding was that I would have to move that into evidence and move on. I believe we had had evidentiary problems with the lab results.

(*See* February 27, 2003 Transcript, pages 52 - 53, attached). However, Mr. Davis testified that at trial, during his direct examination of Defendant, he had Defendant go through a number of incidents of violence that Defendant was aware of, and also discussed with Defendant his fear of Randy. (*See* February 27, 2003 Transcript, page 42, attached).

After reviewing ground 4, the testimony and evidence presented on February 27, 2003, the written closing arguments of both counsel, the court file, and the record, the Court finds that Mr. Davis did attempt to impeach Randy with the toxicology report, but was unsuccessful when Randy indicated that he had not seen the report. Moreover, although Mr. Davis could have deposed medical personnel and gathered further information to impeach Randy's trial testimony, the Court finds that Mr. Davis, during his direct examination of Defendant at the trial, had Defendant go through a number of incidents of violence that Defendant was aware of, and also discussed with Defendant his fear of Randy. Furthermore, the Court finds that there is no reasonable probability that the result of the proceedings would have been different, given the fact that the jury returned a verdict of Aggravated Battery of a Firearm, when Defendant was charged with Attempted Murder in the First Degree with a Firearm. Consequently, this Court finds that counsel has failed to meet the

second prong of *Strickland* in that he has failed to prove how counsel's alleged deficient conduct resulted in prejudice. Since Defendant has failed to meet the second prong of Strickland, it is unnecessary to address the performance component. *See Kennedy v. State*, 547 So. 2d 912, 914 (Fla. 1989). As such, no relief is warranted upon ground 4.

Dkt. 10, Ex. 21 at 2-3, 7-10.

To establish a prima facie claim of ineffective assistance of counsel at trial, Petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance is performance which is objectively unreasonable under prevailing professional norms. *Id.* at 688. Prejudice results when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "[T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quoting *Burger v. Kemp*, 483 U.S. 776 (1987)). Because the ultimate resolution of ineffective assistance of counsel claims is a mixed question of law and fact, *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001); *Meeks v. Moore*, 216 F.3d 951, 959 (11th Cir. 2000), the presumption of correctness contained in § 2254(e)(1) does not apply to this determination. *Parker v. Head*, 244 F.3d 831, 835-37 (11th Cir. 2001). State court findings of historical facts made in the course of evaluating an ineffectiveness claim are, however, subject to a presumption of correctness under 28 U.S.C. § 2254(e) unless the petitioner demonstrates by clear and convincing evidence that they are incorrect, *see Williams v. Taylor,* 529 U.S. 362, 412-13 (2000), a burden that Petitioner has failed to carry. *See* § 2254(e)(1) ("[A] determination of a factual issue made by a state court

shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence").

The trial court set forth the correct standard of review for an ineffective assistance of counsel claim (Dkt. 21 at PCR 405-06).  Thus, to be entitled to relief under § 2254, Petitioner must establish that the trial courts's application of the *Strickland* standard in reaching the determination that the claim raised in his Rule 3.850 motion lacks merit was objectively unreasonable or that the decision "was based on an unreasonable determination of the facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d).

In the present case, the record supports the trial court's finding that trial counsel attempted to impeach Baggett with the toxicology report, albeit unsuccessfully. In response to trial counsel's queries, Baggett twice testified that he had never seen the hospital's toxicology report.  Trial counsel then pursued another line of questioning.

During the Rule 3.850 evidentiary hearing, trial counsel testified that he considered having the toxicology report admitted into evidence but there were "evidentiary problems with the results coming in." Dkt. 10, Ex. 11 at PCR 337.  Trial counsel decided that the best strategy under the circumstances was to ask Baggett if he was drinking on the day in question and if he denied having done so, attempt to get Baggett to admit that he was lying by confronting him with the toxicology report. Given trial counsel's belief that there was a problem with the results of the laboratory tests that affected the admissibility of the toxicology report into evidence, his failure to proffer the toxicology report as evidence cannot be viewed as deficient performance.

"Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected

in these circumstances if they are based on professional judgment." *Strickland*, 466 U.S. at 681. Under Florida law, trial counsel's strategic decisions do not constitute ineffective assistance of counsel if alternative courses of action have been considered and rejected. *Whitfield v. State*, 923 So.2d 375 (Fla. 2005). Where information known to trial counsel undermines the reliability of a report, trial counsel is not ineffective for pursuing a reasonable alternative strategy to having the report admitted into evidence. Here, trial counsel clearly considered alternative means of proceeding and in his professional judgment decided not to present evidence of Baggett's intoxication where, in trial counsel's opinion, the admissibility of the evidence was questionable.

As the Eleventh Circuit has cautioned, "[t]he widespread use of the tactic of attacking . . . counsel by showing what 'might have been' proves that nothing is clearer than hindsight – except perhaps the rule that we will not judge trial counsel's performance through hindsight." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (quoting *Waters v. Thomas,* 46 F.3d 1506, 1514 (11th Cir. 1995) (*en banc*). *See also United States v. Costa*, 691 F.2d 1358, 1363 (11th Cir. 1982) ("The standard for constitutionally effective assistance of counsel is not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance.").

Given the record before the Court, trial counsel's performance clearly met the standard for effective assistance of counsel guaranteed by the Sixth Amendment. Petitioner fails to overcome the presumption that trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Having failed to demonstrate that trial counsel's

performance was "outside the wide range of professionally competent assistance," *see id.*,

Petitioner fails to satisfy the *Strickland* test.

Petitioner has failed to demonstrate that the trial court's adjudication of this claim

was contrary to or an unreasonable application of clearly established Federal law or

resulted in a decision that was based on an unreasonable determination of the facts in light

of the evidence presented.  Having failed to make the necessary showing, Petitioner has

not demonstrated that he is entitled to federal habeas relief on this claim.

## GROUND THREE

In Ground Three, Petitioner contends that trial counsel's failure to introduce the

toxicology report into evidence, when considered cumulatively with the trial court's alleged

error in rejecting trial counsel's attempt to introduce the 1988 psychological report

assessing Baggett's competency to stand trial, denied him a fair trial in violation of his right

to due process[8] (Dkt. 1 at 12). This is not the claim that Petitioner presented to the trial

court in his Rule 3.850 motion. There, Petitioner argued that "when considering the

cumulative effect [of] trial counsel's representation, it is clear that the level falls well below

that of reasonably competent counsel" (Dkt. 10, Ex. 010 at PCR 43).  A claim of cumulative

error by trial counsel <u>and</u> the trial court was not raised on direct appeal or in Petitioner's

Rule 3.850 proceedings. The claim is, thus, procedurally defaulted. *See Bailey v. Nagle*,

172 F.3d at 1305.

---

[8]*See United States v. Baker,* 432 F.3d 1189, 1223 (11th Cir. 2005) ("The cumulative error doctrine 'provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal'" (citation omitted)).

Petitioner has not asserted, much less demonstrated, that he is entitled to proceed despite the procedural bar to his claim under either the cause and prejudice or manifest injustice exception, discussed *supra* at 15-16. Petitioner fails to proffer "specific facts which support a finding that one of these exceptions to the procedural default rule exists," *Hill v. Jones*, 81 F.3d 1015 (11th Cir. 1996). The merits of Ground Three will not, therefore, be addressed. *See Kight v. Singletary*, 50 F.3d 1539, 1541 (11th Cir. 1995).

## GROUND FOUR

Petitioner next contends that the trial court violated his right to be tried by an impartial jury by failing to question the entire jury panel about prejudicial statements made by Baggett and Baggett's father to Mr. Neiswonger while in the presence of other jurors, depriving him of his right to a fair trial. For reasons discussed below, this claim lacks merit.

The record reflects that when voir dire commenced, Mr. Neiswonger informed the trial court that while he did not know him by name, he knew Baggett's father "by going to the restaurant and stuff talking to him" (Dkt. 10, Ex. 003, Vol. I at Tr. 10; 13). When the prosecutor asked the jury panel if they understood that "as the defendant sits here today, he's presumed innocent," Mr. Neiswonger responded, "I heard what happened so –." The prosecutor made further inquiry: "So you know the facts of this case?" To which Mr. Neiswonger responded affirmatively. *Id.* at Tr. 48.   After questioning several other jurors, the prosecutor returned to Mr. Neiswonger and asked him if he had any "predetermined conclusions" regarding the case. Mr. Neiswonger responded in the negative. *Id.* at Tr. 49.

During a bench conference after the prosecutor concluded her voir dire, trial counsel moved to strike the entire jury panel, arguing that it was tainted by Mr. Neiswonger's response that he already knew the facts of the case. *Id.* at Tr. 53-54. Stating that he could

"only base [his decision] on what appears on the record and there's nothing in it that would indicate [that Mr. Neiswonger was] for conviction or for a not guilty verdict," the trial court denied trial counsel's motion. *Id*. at Tr. 55.

As voir dire progressed, trial counsel asked Mr. Neiswonger if it was safe to say that he already knew some of the allegations and facts of the case. When Mr. Neiswonger responded affirmatively, trial counsel followed up by asking "do you or do you not and just answer [sic] have kind of a preconceived idea as to what you think already happened?" Mr. Neiswonger again responded in the affirmative. *Id.* at Tr. 78.

When voir dire concluded, the prospective jurors were excused from the courtroom, and trial counsel moved to strike the jury panel on grounds that Petitioner's grandfather witnessed Mr. Neiswonger speaking to the Baggetts in the hallway outside the courtroom. *Id*. at Tr. 83. The trial court stated that it was not prepared to make "determinations as to whether or not people have, a juror has heard things or done things unless we have some evidence to prove it" and informed counsel that he was prepared to sequester all the witnesses. *Id*. at Tr. 85. The trial court then granted trial counsel's request to have Mr. Neiswonger return to the courtroom for questioning. *Id.*

When questioned by the trial court and defense counsel, Mr. Neiswonger acknowledged that he had discussed the facts of the case with Baggett's father. *Id*. at Tr. 89. Mr. Neiswonger twice stated that no other members of the jury panel were nearby when he was conversing with Baggett's father. Mr. Neiswonger further stated that he did not think it was possible that any members of the jury panel overheard their conversation. *Id*. at Tr. 89-90. After Mr. Neiswonger was excused from the courtroom, the trial judge asked whether there was anything more trial counsel wanted to say on the issue. Instead, trial

counsel moved to strike Mr. Neiswonger. The strike was granted and jury selection continued. Trial counsel did not raise his motion to strike the panel again or request that any other prospective jurors be questioned, accepting the panel without objection. *Id*. at Tr. 96.

Petitioner's claim that the trial court denied him a fair trial by failing to question other members of the jury panel was raised and rejected on direct appeal, *see* Dkt. 10, Ex. 6. *See Brannon v. State*, 799 So. 2d 1033 (Fla. 2d DCA 2001). Petitioner reasserted the claim in his first Rule 3.850 motion. The trial court rejected the claim, finding: "[s]ince [Petitioner] raised this issue on direct appeal, [Petitioner] is procedurally barred from raising it in the instant motion." Dkt. 10, Ex. 11 at PCR 141-42. *See* Fla. R. Crim. P. 3.850(c).

Not deterred, Petitioner raised the claim again in his second Rule 3.850 motion, asserting that the claim should be addressed on the merits because it was based on newly discovered evidence. After hearing testimony during the Rule 3.850 evidentiary hearing, the trial court found as follows:

> In ground 1, Defendant claims newly discovered evidence in that he was tried by a fundamentally tainted jury. Specifically, Defendant claims that Mr. Francis Neiswonger, a potential juror in Defendant's trial, recently told Mr. Harry Pierce, Defendant's grandfather, that potential jurors overheard a conversation between the alleged victim, the alleged victim's father, and a prospective juror. Specifically, Defendant claims that Charlie E. Baggett, the victim's father told a prospective juror that "Jasen [Defendant] was a rock head and stayed on dope and he did this to my son." Mr. Baggett also stated, "he [Defendant] needed to get life in prison . . . my son has no life." Defendant further claims that the victim told the prospective juror, "my nephew [Defendant] and I got into an argument. I didn't think he would ever shoot me. I guess he was so pilled up he didn't think too clear." In his Motion, Defendant states that the Court did inquire of prospective juror Mr. Neiswonger as to whether any other jurors heard the conversation, and Mr. Neiswonger responded that he didn't think so.
>
> However, Defendant has attached to his Motion an affidavit from Mr. Francis Neiswonger stating that there were jurors around that easily could have and

should have heard the conversation. Mr. Neiswonger further states in his affidavit that Ms. Patricia Dawson, the Assistant State Attorney, was engaged in a conversation with a prospective juror who actually sat on the jury.

With regard to the allegation that there were jurors around that easily could have and should have heard the conversation between the Baggetts, at the evidentiary hearing, Mr. Neiswonger testified that he was called for jury selection on March 22, 2000, and while he was waiting outside the courtroom as a prospective juror, he ran into Randy Baggett and Charles Baggett. (*See* February 27, 2003 Transcript, page 21, attached). Mr. Neiswonger further testified that they told him that the Defendant had shot Randy in the arm and in the back because Defendant was a dope head and was probably all pilled up. (*See* February 27, 2003 Transcript, pages 22-23, attached). Mr. Neiswonger stated that he could not testify that any other people overheard the conversation that he had with the Baggetts. (*See* February 27, 2003 Transcript, pages 32 and 35, attached).

At the same hearing, Defendant's grandfather Mr. Harry Pierce testified that he was outside the courtroom on May 22, 2000 for the trial of Defendant, when he heard a conversation taking place between the Baggetts and Mr. Neiswonger. (*See* February 27, 2003 Transcript, pages 57 - 58, attached). Mr. Pierce testified that he was concerned with what the Baggetts were talking about when all the prospective jurors were standing around, and subsequently brought it to the bailiff['s] attention. (*See* February 27, 2003 Transcript, page 60, attached).

After reviewing this portion of ground 1, the testimony and evidence presented on February 27, 2003, the written closing arguments of both counsel, the court file, and the record, the Court finds that neither Mr. Neiswonger nor Mr. Harry Pierce could not [sic] testify with certainty that any other people overheard the conversation that Mr. Neiswonger had with the Baggetts. Consequently, Defendant has failed to prove that potential jurors overheard the conversation between the Baggetts and Mr. Neiswonger. As such, there has been no evidence that the jury was tainted, and no relief is warranted upon this portion of ground 1.

With regard to the allegation that Ms. Dawson was engaged in a conversation with a prospective juror who actually sat on the jury, at the evidentiary hearing, Mr. Neiswonger testified that he noticed the prosecutor Ms. Patricia Dawson and a black male, who later was identified to him to be a juror on Defendant's case, near the courtroom door. (*See* February 27, 2003 Transcript, pages 23-24, attached). Mr. Neiswonger further testified that although he saw the black male talking to Ms. Dawson, he did not hear what was being said between them. (*See* February 27, 2003 Transcript, pages 30-31, attached). Lastly, Mr. Neiswonger stated that he did not know what

the person he identified as Ms. Dawson and the other gentleman were talking about. (*See* February 27, 2003 Transcript, page 34, attached).

Mr. Harry Pierce testified that he saw a black gentleman, who was later identified to him as a member of the jury, standing against the wall, but does not know if the black gentleman went inside the courtroom. (*See* February 27, 2003 Transcript, pages 59 - 62, attached). Moreover, Mr. Pierce testified that he does not recall seeing the gentleman sitting on the jury when he testified at Defendant's trial. (*See* February 27, 2003 Transcript, page 64, attached).

At the evidentiary hearing, when asked if she recalled being out in the hallway outside the courtroom talking to an individual on the day of Defendant's trial who became a member of the jury, the Assistant State Attorney Ms. Patricia Dawson testified as follows:

> No. If I would have and I observed him in the jury box I would have informed the judge. Based on my recollection, no because I didn't inform the judge of anything like that.

(*See* February 27, 2003 Transcript, page 68, attached); (*See also* February 27, 2003 Transcript, page 70, attached).

After reviewing this portion of ground 1, the testimony and evidence presented on February 27, 2003, the written closing arguments of both counsel, the court file, and the record, the Court finds that although Mr. Neiswonger saw a black male talking to Ms. Dawson, he did not hear what was being said between them. Moreover, the Court finds that Mr. Pierce did not see the gentleman sitting on the jury when he testified at Defendant's trial. Furthermore, the Court finds that if Ms. Dawson did not [sic] have contact with a juror, she would have brought it to the Court's attention. Lastly, there has been no evidence that the person Ms. Dawson was talking to did, in fact, become a member of Defendant's jury. Consequently, Defendant has failed to prove that Ms. Dawson had a conversation with a member of Defendant's jury. As such, there has been no evidence that the jury was tainted, and no relief is warranted upon this portion of ground 1.

Dkt. 10, Ex. 21 at PCR 413-17.

The Sixth Amendment guarantees the accused a "trial, by an impartial jury . . ." in federal criminal prosecutions. U.S. Const. amend VI.  Because "trial by jury in criminal cases is fundamental to the American scheme of justice," the Due Process Clause of the Fourteenth Amendment guarantees the same right to the accused in state criminal

prosecutions. *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968). The Supreme Court has acknowledged, however, that "(i)mpartiality is not a technical conception. It is a state of mind." *United States v. McIver*, 688 F.2d 726, 728-29 (11th Cir. 1982) (quoting *United States v. Wood*, 299 U.S. 123, 145 (1936)). Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, the conduct of voir dire of a jury panel is a matter directed to the sound discretion of the trial judge, subject to the essential demands of fairness. *See Mu'Min v. Virginia*, 500 U.S. 415, 423 (1991); *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981). Trial courts "retain[ ] great latitude in deciding what questions should be asked on voir dire. *Mu'Min v. Virginia*, 500 U.S. at 424.

Under both Federal and Florida law, it is within the discretion of the trial court judge to determine whether remarks made by a member of the venire panel during voir dire are prejudicial. *See Irvin v. Dowd*, 366 U.S. 717, 723-24 (1961); *United States v. Khoury*, 901 F.2d 948 (11th Cir. 1990); *Randolph v. State*, 562 So.2d 331, 337 (Fla. 1990) (comment by a prospective juror that she had heard that the victim had been "brutally murdered" did not taint the venire panel).

In this circuit, the party challenging the refusal to strike a panel "must demonstrate that the juror in question exhibited actual bias: That is, either an express admission of bias, or proof of specific facts showing such a close connection to the circumstances of the case that bias must be presumed." *United States v. Khoury,* 901 F.2d 948, 955 (11th Cir. 1990) (internal quotations and citations omitted). Although Petitioner suggests that prospective jurors may have overheard Baggett's comments, he does not address any particular seated

juror's voir dire[9] and fails to provide clear and convincing evidence that the jurors empaneled could not be impartial. The record reflects that the trial court quickly considered this alleged impropriety, and Petitioner has shown no abuse of discretion in the trial court's actions or rulings. Moreover, Petitioner has not shown that he was actually prejudiced by Baggett's comments to Mr. Neiswonger. Mr. Neiswonger testified that he and the Baggetts were speaking in a normal tone and he could not be sure that anybody overheard what was said. Harry Pierce, petitioner's grandfather, testified that he overheard the conversation between the Baggetts and Mr. Neiswonger, but like Mr. Neiswonger, Mr. Pierce could not say whether anybody other than himself overheard the conversation.

In rejecting the claim, the trial court found that Petitioner failed to establish that potential jurors overheard the conversation between Mr. Neiswonger and the Baggetts. Having reviewed the transcripts, the Court finds that the trial court was well within its discretion to conclude that Mr. Neiswonger's comments were not of such nature as to taint the entire venire panel. Mr. Neiswonger's responses during voir dire did not reveal any facts surrounding the case or express an opinion as to Petitioner's culpability of the charged offenses.

In their responses during voir dire, each of the individuals selected to serve on Petitioner's jury evidenced an ability to evaluate the evidence in light of the presumption

_____

[9]To the extent that the petition is read to assert that there was improper contact between the prosecutor and an unidentified man she was seen conversing with in the hallway outside the courtroom, this claim lacks merit.  Mr. Neiswonger testified that he did not see the unidentified man in the courtroom, but was later told by Mr. Pierce, Petitioner's grandfather, that the man served on the jury (Dkt. 10, Ex. 18 at PCR 308). When queried about his statement to Mr. Neiswonger, Mr. Pierce admitted that he did not see the unidentified man in the courtroom when he testified, but he later learned from Baggett that the man served on the jury, referencing a letter Baggett send to the trial court on July 20, 2000, *see* Dkt. 1, Ex. 5, urging the trial court to set aside the jury's verdict and grant Petitioner a new trial on the ground that the jury panel was tainted by Baggett's conversation with Mr. Neiswonger, *see id.* at PCR 345-46. The trial court found that Petitioner failed *to prove that the prosecutor had a conversation with a member of the jury, and Petitioner has not overcome* the presumption of correctness accorded the trial court's factual findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e).

of innocence, and their unequivocal responses to direct questions posed by counsel and the trial court confirm that no further inquiry was warranted.

The Eleventh Circuit addressed the issue of challenges to prospective jurors in *Dupree v. Thomas*, noting that "on federal habeas corpus review, a state court's determination as to the partiality of a particular juror is entitled to a presumption of correctness." 946 F.2d 784, 788 (11th Cir. 1991) (citation omitted).

In *Patton*, the Supreme Court concluded that the question of juror impartiality should be resolved by asking whether the juror swore he could set aside any opinion he might hold and decide the case solely on the evidence, and whether the juror's protestation of impartiality was believable. *Patton v.* Yount, 467 U.S. 1025, 1036 (1984). The question for this Court is then "whether there is fair support in the record for the state court's conclusion that the jurors here would be impartial." *Id.* at 1038. Ms. Mastreopietro, Ms. Herrera, Mr. Crowder, Ms. Comfort, Mr. Jones, and Mr. McGinnis were selected to serve on the jury, with Mr. Clark chosen as the alternate. Nothing in their responses to questioning during voir dire raises the possibility that any of these jurors would not be impartial. *See* Dkt. 10, Ex. 003, Vol. I, at 17-18, 41, 62, 71-2 (Mastropietro); 42-43, 45, 57, 62, 64 (Herrera); 18, 43, 52, 61, 72-5 (Crowder); 43-44, 60 (Comfort); 16, 44, 48, 57, 70 (Jones); 29, 45, 57, 66 (McGinnis); 45-46, 66 (Clark). The record establishes that the jurors evinced their ability to evaluate the evidence objectively and render a fair decision.

Having had the benefit of hearing testimony from trial counsel, Petitioner, Mr. Neiswonger, Mr. Pierce, and the prosecutor and an opportunity to observe their demeanor on the witness stand, the trial court determined that  there was no evidence that the jury was tainted. Determinations of witness credibility are best made by the trial court judge,

who can assess the demeanor and candor of the witnesses. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983); *Baldwin v. Johnson*, 152 F.3d 1304, 1317 (11th Cir. 1998) (citing *Smith v. Kemp*, 715 F.2d 1459, 1465 (11th Cir.) ("Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing."), *cert. denied*, 464 U.S. 1003 (1983)); *Porter v. State*, 788 So.2d 917, 923 (Fla. 2001) (recognizing the trial court's "superior vantage point in assessing the credibility of witnesses and in making findings of fact").

The Court finds that the trial court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law. This claim will, therefore, be denied.

### Conclusion

For the foregoing reasons, the Court finds that Petitioner has failed to establish that he is entitled to federal habeas relief.

ACCORDINGLY, the Court **ORDERS** that:

1. The Petition for Writ of Habeas Corpus is **DENIED** (Dkt. 1).

2. The **Clerk** shall enter judgment against Petitioner, terminate all pending motions, and close this case.

**ORDERED** in Tampa, Florida, on November 28th , 2006.

JAMES D. WHITTEMORE
United States District Judge

Copies furnished to:
All Parties/Counsel of Record